**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AIR DYNAMICS INDUSTRIAL SYSTEMS, INC.,** | : | **CIVIL ACTION NO. 1:19-CV-2073** |
| | : | |
| | : | **(Judge Conner)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **D. AARON LEHMAN and SYSTEM OF SYSTEMS, INC.,** | : | |
| | : | |
| | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

Plaintiff Air Dynamics Industrial Systems, Inc. ("Air Dynamics"), alleges that defendants D. Aaron Lehman ("Aaron Lehman" or "Aaron") and System of Systems, Inc. ("SS"), acted unlawfully to compete with Air Dynamics. In its complaint, Air Dynamics advances claims for patent infringement, trade secret misappropriation, conversion, tortious interference, breach of the duty of loyalty, and unfair competition. Defendants move to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). We will deny the motion.

**I.    <u>Factual Background & Procedural History</u>**

Air Dynamics is a Pennsylvania company founded by Air Force veteran Dan Lehman, who serves as the company's president. (Doc. 1 ¶ 13). Aaron Lehman, a Pennsylvania resident, is Dan Lehman's son and the founder of SS, which was incorporated in Pennsylvania in March of 2018. (<u>Id.</u> ¶¶ 2, 43, 53). Air Dynamics alleges that Aaron Lehman and SS have been unlawfully marketing Air Dynamics' patented products and using its trade secrets to solicit business.

### A.    The Parties' Business Relationship

In 2002, Dan Lehman hired Aaron Lehman as an employee in Air Dynamics' sales department.  (Id. ¶ 16).  When Aaron was hired, he was a 21-year-old high school graduate; he had no advanced education, industry-specific training, or managerial training or experience.  (Id. ¶ 17).  According to the complaint, Dan Lehman endeavored to give Aaron the training and experience necessary to eventually take over Air Dynamics.  (Id.)

Aaron was employed by Air Dynamics for the next 16 years, during which time he received raises and promotions as he gained experience and developed necessary skills.  (Id. ¶ 18).  Air Dynamics paid for Aaron to obtain an American Conference of Governmental Industrial Hygienists Certification from the University of North Carolina.  (Id. ¶ 19).  The company also allegedly paid for him to be trained in writing programmable logic controller software for Air Dynamics' proprietary and patented equipment described below.  (Id. ¶ 20).  Aaron was promoted to General Manager in 2016.  (Id. ¶ 21).

### B.    Air Dynamics' Products and Patents

Air Dynamics makes "large-scale industrial air-handling systems, including air cleaning and purifying equipment (*i.e.*, filtration systems); pneumatic conveyance systems (*i.e.*, systems that use pressurized air to convey material); vacuum systems; and, of particular relevance here, environmental test chamber systems."  (Id.)  The company sells its environmental test chamber systems to the United States military and other commercial customers under the company's "Desert Wind" trademark.  (Id. ¶ 14).  These systems allow users to simulate "the

conditions of blowing sand, dust, dirt, and other particulates that can be encountered in desert environments." (Id.)

Around 2009, Dan and Aaron Lehman—working in their capacity as Air Dynamics employees and using Air Dynamics' equipment—conceived and developed the Desert Wind™ environmental testing system. (Id. ¶ 22). Air Dynamics filed provisional patent application 61/266,052 on December 2, 2009, and nonprovisional patent application 12/958,132 (the "'132 Application") on December 1, 2010. (Id. ¶ 23). Dan and Aaron Lehman later assigned to Air Dynamics their respective right, title, and interest in the '132 Application, as well as any related patent applications (including divisional applications) or patents. (Id. ¶¶ 25, 27; see also Doc. 1-3; Doc. 1-4). On May 27, 2014, the '132 Application issued as United States Patent 8,733,186 (the "'186 Patent"), titled "Sand and Dust Environmental Test System." (Doc. 1 ¶ 24); see also U.S. Patent No. 8,733,186.

The '186 Patent describes in detail Air Dynamics' Sand and Dust Environmental Test System. According to the patent, the system "is designed for environmental tests that expose test pieces to particulate matter, typically either sand or dust, entrained in an airflow." See U.S. Patent No. 8,733,186 at 12. The '186 Patent describes exactly how, and by what mechanisms, air and particulate matter are circulated through the system. (See id. at 12-18). It also contains several embodiments of the invention. (See id. at 3-10). The '186 Patent includes 15 claims in total—one independent claim and 14 dependent claims. (See id. at 18-19).

On April 15, 2014, Air Dynamics filed patent application 14/253,643 (the "'643 Application") as divisional of the '132 Application. (Doc. 1 ¶ 28). The '643

Application issued on June 13, 2017, as United States Patent 9,677,991 (the "'991 Patent"), also titled "Sand and Dust Environmental Test System."  (Id.); see also U.S. Patent No. 9,677,991.  Dan and Aaron's assignment as it relates to the '991 Patent was recorded on June 5, 2018.  (Doc. 1 ¶ 29).

Like the '186 Patent, the '991 Patent describes the Sand and Dust Environmental Test System using substantially the same language as the '186 Patent.  Compare U.S. Patent No. 8,733,186 with U.S. Patent. No. 9,677,991.  Unlike the '186 Patent, the '991 Patent includes five claims in total—one independent claim and four dependent claims.  See U.S. Patent. No. 9,677,991 at 19-20.

C.    **Air Dynamics' Trade Secrets and Steps to Protect Its Trade Secrets**

Air Dynamics alleges that defendants have misappropriated its technical and nontechnical trade secrets.  According to Air Dynamics, its technical trade secrets include certain proprietary technologies related to its ventilation systems and test chambers.  (Doc. 1 ¶ 30).  Its nontechnical trade secrets include:

(a)    its financial, business and marketing information and strategies;

(b)    the names and particular needs of its customers;

(c)    the names and particular capabilities of its suppliers;

(d)    its future product development and refinement plans;

(e)    the prices it obtains or has obtained and the prices at which it sells or has sold products;

(f)    information that is provided to Air Dynamics on the condition or understanding that it be kept confidential, such as information concerning the

strategies, preferences, and needs of its customers;
[and]

(g)    its own business methods, manner of operation,
strategic direction, priorities, and/or plans.

(Id. ¶ 31).  Air Dynamics alleges that these trade secrets are "not generally known to

the public and would not be ascertainable without the expenditure of substantial

time, effort, and resources."  (Id. ¶ 32).  Moreover, the company alleges that the

information is "extremely valuable to [it] and would be similarly valuable to its

competitors."  (Id.)

According to the complaint, Air Dynamics does not share its confidential or

proprietary information (including its trade secrets) with the public or anyone

outside the company.  (Id. ¶ 33).  And it purportedly takes various steps to protect

that information, including "having new employees sign, when they are hired,

standard confidentiality and noncompete agreements; limiting employee access to

information on a need-to-know basis; limiting employee access to company

computer systems and email on a need-to-use basis; issuing each employee to

whom access was granted with unique, password-protected credentials to access

the company's computer systems; and charging its management, including Aaron

[Lehman], with responsibility for enforcing those policies and protecting Air

Dynamics' Trade Secret Information."  (Id.)  Significantly, however, Aaron is not

bound by a confidentiality agreement.  (Id. ¶ 144).

### D.    Aaron Lehman's Departure from Air Dynamics

Aaron ended his employment with Air Dynamics in March of 2018.  (Id. ¶ 36).

In the time leading up to his departure, tension had apparently developed between

5

Aaron and Dan. (Id. ¶ 35). On his last day, Aaron arrived at the Air Dynamics office uncharacteristically early. (Id. ¶ 34). When Dan asked Aaron why he was there so early, Aaron informed him that he was leaving the company. (Id. ¶ 35). Aaron then purportedly told Dan: "I'm not going to do anything illegal, but I'm going to take business from you." (Id.)

Air Dynamics alleges that, before leaving the company, Aaron stored Air Dynamics' technical trade secrets—critical programmable logic controller and human machine interface software files—on a laptop computer. (Id. ¶ 37). These proprietary software files are used to control operation of a Desert Wind™ system for a major military project. (Id.) Air Dynamics avers that Aaron took the laptop containing the software files with him when he left the company. (Id. ¶ 38). Aaron has allegedly failed to return the laptop, despite multiple requests from Air Dynamics. (Id. ¶ 39).

After Aaron left the company, Air Dynamics' military customer—whose software files were taken by Aaron—experienced complications that required the original software to be restored on its system. (Id. ¶ 40). According to the *allegata*, Air Dynamics was unable to restore the software because Aaron had taken the original version with him. (Id.) The client instead contacted Aaron directly; Aaron restored the original software on the client's system. (Id. ¶ 41). Air Dynamics has purportedly confirmed that the software used in the restoration was in fact Air Dynamics' proprietary software. (Id. ¶ 42).

Air Dynamics, with assistance from forensic computer expert Catzen Computer Consulting Corporation ("Catzen"), also examined the hard drive from

Aaron's workplace computer at Air Dynamics.  (<u>Id.</u> ¶¶ 46, 47, 51).  The examination
allegedly revealed that, on several occasions, Aaron copied Air Dynamics' highly
sensitive files onto noncompany external storage drives.  (<u>Id.</u> ¶ 48).  More
specifically, Catzen uncovered evidence that Aaron copied his work emails,
financial accounting records, internal business files, customer information, sales
and marketing information, engineering-related information, manufacturing
related information, and other miscellaneous work data.  (<u>Id.</u> ¶ 50(a)-(e)).  Catzen
also purportedly discovered that Aaron had been using his work computer to form
SS while he was still employed at Air Dynamics.  (<u>Id.</u> ¶¶ 50(g)-(h), 53).

        According to the complaint, SS has been attempting to sell components of Air
Dynamics' patented systems and Aaron has been using Air Dynamics' trade secrets
to divert business from Air Dynamics to SS.  (<u>Id.</u> ¶ 43; <u>see also</u> <u>id.</u> ¶ 55, 56).  Air
Dynamics claims, for example, that Aaron has been using its trade secrets to siphon
business away from one of its South Korean customers.  While serving as Air
Dynamics' General Manager, Aaron had gained extensive knowledge of confidential
business, financial, and customer information concerning the company's business
development in South Korea.  (<u>Id.</u> ¶ 57).  Aaron was responsible for contract
negotiations between Air Dynamics and customers in South Korea, and he travelled
there to meet with those customers the year before he left the company.  (<u>Id.</u>)  Air
Dynamics alleges that in May 2019, Aaron and a former Air Dynamics employee
now working for SS traveled to South Korea to meet with Air Dynamics' customers.
(<u>Id.</u> ¶ 59).  Aaron and his associate allegedly spent several weeks in a region of

South Korea where one of Air Dynamics' key prospective customers is located.  (<u>Id.</u> ¶ 60).

Air Dynamics asserts that Aaron has also held himself out as the owner of Air Dynamics' patents for its Desert Wind™ systems.  (<u>Id.</u> ¶ 63).  While at Air Dynamics, Aaron was the primary contact for the United States Navy, which was and remains one of Air Dynamics' customers with respect to the Desert Wind™ systems.  (<u>Id.</u> ¶¶ 61, 62).  After Aaron's departure, a Navy employee contacted Air Dynamics and informed them that Aaron had represented that he owns the patents, possesses the Desert Wind™ drawings and schematics, and has the exclusive right to sell patented Desert Wind™ systems.  (<u>Id.</u> ¶ 63).

Counsel for Air Dynamics sent Aaron and SS a cease and desist letter on August 3, 2018.  (<u>Id.</u> ¶ 44).  The parties attempted (but failed) to resolve their dispute in good faith.  (<u>Id.</u> ¶ 45).  In response to Air Dynamics' cease and desist letter, Aaron and SS did not deny that they were making or selling products that practice Air Dynamics' patents.  (<u>Id.</u> ¶ 58).  They instead disputed the ownership of the patents and the validity of the patents' assignment; questioned whether defendants' products could trigger infringement liability; admitted that Aaron "provided an Air Dynamics customer with an unauthorized copy of the proprietary Air Dynamics software" after leaving the company; and proposed to enter into negotiations over a license to practice Air Dynamics' patents.  (<u>Id.</u>)

### E.    Procedural History

Air Dynamics filed a complaint on December 5, 2019, asserting eight counts of unlawful conduct.  Count One alleges infringement of the '186 Patent and Count

Two alleges infringement of the '991 Patent, both in violation of 35 U.S.C. § 271 *et seq.*  Count Three alleges misappropriation of trade secrets, in violation of the federal Defend Trade Secrets Act, 18 U.S.C. § 1832 *et seq.*  Counts Four, Five, Six, Seven, and Eight allege state-law claims for conversion, tortious interference with prospective contracts, tortious interference with existing contracts, breach of the common law fiduciary duty of loyalty, and unfair competition, respectively.  Defendants move to dismiss the complaint under Federal Rules of Procedure 12(b)(1) and 12(b)(6).  The motion is fully briefed and ripe for disposition.

## II.   Legal Standards

### A.   Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) provides that a court may dismiss a claim for lack of subject matter jurisdiction.  See Fed. R. Civ. P. 12(b)(1).  Such jurisdictional challenges take one of two forms: (1) parties may levy a "factual" attack, arguing that one or more of the pleading's factual allegations are untrue, removing the action from the court's jurisdictional ken; or (2) they may assert a "facial" challenge, which assumes the veracity of the complaint's allegations but nonetheless argues that a claim is not within the court's jurisdiction.  Lincoln Benefit Life Co. v. AEI Life, LLC, 800 F.3d 99, 105 (3d Cir. 2015) (quoting CNA v. United States, 535 F.3d 132, 139 (3d Cir. 2008)).  In either instance, it is the plaintiff's burden to establish jurisdiction.  See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).

**B.      Federal Rule of Civil Procedure 12(b)(6)**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the

dismissal of complaints that fail to state a claim upon which relief may be granted.

FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the

court must "accept all factual allegations as true, construe the complaint in the light

most favorable to the plaintiff, and determine whether, under any reasonable

reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County

of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings,

Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In addition to reviewing the facts

contained in the complaint, the court may also consider "exhibits attached to the

complaint, matters of public record, [and] undisputedly authentic documents if the

complainant's claims are based upon these documents." Mayer v. Belichick, 605

F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol.

Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the

defendant fair notice of what the . . . claim is and the grounds upon which it rests."

Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly,

550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts

a three-step inquiry. See Santiago v. Warminster Township, 629 F.3d 121, 130-31

(3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a

plaintiff must plead to state a claim.'" Id. at 130 (alteration in original) (quoting

Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a

claim must be separated; well-pleaded facts are accepted as true, while mere legal

conclusions may be disregarded.  <u>Id.</u> at 131-32; <u>see</u> <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief."  <u>Iqbal</u>, 556 U.S. at 679 (citing <u>Twombly</u>, 550 U.S. at 556); <u>Twombly</u>, 550 U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Iqbal</u>, 556 U.S. at 678.

## III.   <u>Discussion</u>

Defendants move to dismiss each of Air Dynamics' claims.  First, they seek dismissal of Air Dynamics' patent infringement and trade secret claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  Defendants also seek dismissal of Air Dynamics' state-law claims under Federal Rule of Civil Procedure 12(b)(1).

### A.    **Patent Infringement Claims**

Defendants argue that the complaint fails to adequately plead claims for patent infringement.  They posit that Air Dynamics fails to connect its factual assertions to the asserted claims at issue.  Specifically, defendants contend that Air Dynamics has not pled with particularity: (1) the patent claims at issue, (2) the allegedly infringing features or products, and (3) how those features or products infringe the patent claims at issue.  (<u>See</u> Doc. 14 at 5-9; Doc. 22 at 2-4).  In response, Air Dynamics asserts that it has alleged sufficient facts placing defendants on notice of their allegedly infringing conduct.  (Doc. 15 at 9-15).  We agree with Air Dynamics.

A patent is infringed when one "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor."  35 U.S.C. § 271(a).  In patent infringement cases, as in any standard civil action, a plaintiff "need not 'prove its case at the pleading stage.'"  Nalco Co. v. Chem-Mod, LLC, 883 F.3d 1337, 1350 (Fed. Cir. 2018) (quoting In re Bill of Lading Transmission & Processing Sys. Patent Litig., 681 F.3d 1323, 1339 (Fed. Cir. 2012)).  Rather, the complaint need only put the "potential infringer . . . on notice of what activity . . . is being accused of infringement."  Id. (quoting K-Tech Telecomms., Inc. v. Time Warner Cable, Inc., 714 F.3d 1277, 1284 (Fed. Cir. 2013)).  In other words, "very little is required in order to plead a claim of patent infringement."  F2VS Techs., LLC v. Ruckus Wireless, Inc., No. CV 17-756, 2018 WL 10048288, at *1 (D. Del. July 31, 2018).

The Court of Appeals for the Federal Circuit's opinion in Disc Disease Solutions Inc. v. VGH Solutions, Inc., 888 F.3d 1256 (Fed. Cir. 2018), illustrates this burden.  The district court in that case dismissed infringement claims after concluding that plaintiffs had "failed to 'explain how Defendants' products infringe on any of Plaintiff's claims' because it 'merely alleges that certain of Defendants' products 'meet each and every element of at least one claim' of Plaintiff's patents.'"  Id. at 1260 (quoting Disc Disease Sols., Inc. v. VGH Sols., Inc., No. 1:15-CV-188, 2016 WL 6561566, at *3 (M.D. Ga. Nov. 2, 2016)).  The Federal Circuit reversed the district court and held that the complaint provided fair notice of the alleged infringement.  Id.  The court explained: "Specific facts are not necessary; the statement need only

12

'give the defendant fair notice of what the . . . claim is and the ground upon which it rests.'" Id. (quoting Erickson v. Pardus, 551 U.S. 89, 93 (2007) (internal quotation marks omitted)). The court noted that the case involved a simple technology, that the asserted patents were attached to the complaint and consisted of relatively few independent claims, and that the complaint identified the accused products and alleged that they met "each and every element of at least one claim." Id. That was enough to put the defendants on "fair notice of infringement of the asserted patents." Id.

Defendants argue that Air Dynamics has not drawn a connection between its factual allegations of infringement and the patent claims at issue. But the complaint in this case easily satisfies Disc Disease Solutions' benchmark. Air Dynamics alleges that defendants offered to sell the same Desert Wind™ system covered by and described in Air Dynamics' '186 and '991 Patents. (See Doc. 1 ¶¶ 15, 22-29, 58, 63, 73, 86). That system, according to the complaint, was "conceived and developed" by Dan and Aaron Lehman while they were both working at Air Dynamics. (Id. ¶ 22). Indeed, Dan and Aaron are listed as the inventors of both patents, which are attached to the complaint and each include one independent claim. (See Doc. 1-2 at 1, 18-19; Doc. 1-5 at 1, 19-20). Finally, the complaint alleges that the defendants "have been attempting to sell components of Air Dynamics' patented systems," (Doc. 1 ¶¶ 43(a), 59-63), and that defendants' "products and/or components and/or services . . . infringe at least one claim" covered by the '186 and '991 Patents, (id. ¶¶ 71, 83; see also id. ¶¶ 72, 84). It strains common sense—a factor the Supreme Court commands us to consider, see Iqbal, 556 U.S. at 679 (citation

omitted)—to believe that defendants in this case are ignorant of their allegedly infringing conduct.

There is no absolute requirement that plaintiffs identify with enhanced particularity the specific patent claim at issue. Plaintiffs are not required to "plead facts establishing that each element of an asserted claim is met." Nalco, 883 F.3d at 1350. Plaintiffs will instead survive the Rule 12 stage so long as they offer enough information to put defendants on "fair notice of infringement of the asserted patents." Disc Disease Sols., 888 F.3d at 1260. Air Dynamics has done so here. And we are not troubled that Air Dynamics is, at this juncture, unable to identify by name or description one of defendants' specific products or features that is allegedly infringing its patents. The parties operate in an industry in which competing products are not available to the general public. The mere inability of Air Dynamics to purchase, analyze, and identify one of defendants' products before filing suit does not, by itself, bar them from filing suit altogether. See K-Tech Telecomms., 714 F.3d at 1286 (explaining that the inability to "point to the specific device or product . . . especially when the operation of those systems is not

ascertainable without discovery—should not bar [the] filing of a complaint").[1]  In

any event, defendants are not allegedly violating Air Dynamics' patents through the

sale of some unidentified and amorphous product; they are alleged to be violating

Air Dynamics' patents through the sale of *the very same* system.  (Doc. 1 ¶¶ 58, 63,

73, 86).

> **B.      Trade Secret Claims**

Air Dynamics also asserts that defendants have misappropriated its technical

and nontechnical trade secrets in violation of the Defend Trade Secrets Act

("DTSA"), 18 U.S.C. § 1832 *et seq*.  Air Dynamics claims to have technical trade

secrets in the form of proprietary "programmable logic controller" and "human

machine interface" software used with its Desert Wind™ system.  (Doc. 1 ¶¶ 30, 31,

37).  It further asserts ownership over nontechnical trade secrets including, for

example, confidential business information and strategy; the names, capabilities,

and needs of customers and suppliers; product development and refinement plans;

and pricing information.  (Id.)  Defendants contend that Air Dynamics' customer-

related information is not a trade secret at all, that Aaron's activities are nothing

---

[1] The issue in K-Tech Telecommunications was whether the complaint complied with "Form 18," a now-abrogated pleading method.  See FED. R. CIV. P. 84, comments to 2015 amendment.  Yet, we have no reason to believe that the Federal Circuit's position regarding the adequacy of pre-discovery pleading would be any different today.  The Federal Circuit was concerned that a defendant would be permitted to "shield itself from a complaint for direct infringement by operating in such secrecy that the filing of a complaint itself is impossible."  K-Tech Telecomms., 714 F.3d at 1286.  This concern remains despite the abrogation of Form 18.  See Huawei Techs. Co. v. T-Mobile US, Inc., No. 216CV00052, 2017 WL 1129951, at *2 (E.D. Tex. Feb. 21, 2017), report and recommendation adopted, No. 2:16-CV-52, 2017 WL 1109875 (E.D. Tex. Mar. 24, 2017).

more than legitimate competition using personal business contacts, and that—to the extent Air Dynamics has identified trade secrets—it has failed to take reasonable measures to keep its information secret.[2]

The DTSA prohibits misappropriation by acquisition, disclosure, or use of trade secrets.  See 18 U.S.C. § 1832 *et seq.*  Plaintiffs must allege the defendant "misappropriated" a "trade secret," that the trade secret "derives independent economic value" by virtue of its secrecy and would be valuable to others, that the trade secret is not otherwise "readily ascertainable through proper means," and that the trade secret's owner has taken "reasonable measures" to keep it secret.  Id. § 1839(3), (3)(A), (3)(B).  The term "trade secret" includes "all forms and types" of information.  Id. § 1839(3).

In deciding whether information is a trade secret, courts evaluate several factors:

> (1) the extent to which the information is known outside of the company's business; (2) the extent to which the information is known by employees and others involved in the company's business; (3) the extent of the measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company and its competitors; (5) the amount of effort or money the company spent in developing the information;

---

[2] Air Dynamics ostensibly reads defendants' motion to dismiss to challenge its identification of the subject trade secrets.  (See Doc. 17-18).  We do not read the motion to be making such an assertion, but we nonetheless agree with Air Dynamics that it has sufficiently identified the trade secrets at issue.  See Magnesita Refractories Co. v. Tianjin New Century Refractories Co., No. 1:17-CV-1587, 2019 WL 1003623, at *9 (M.D. Pa. Feb. 28, 2019) (collecting cases) (Conner, C.J.).  The complaint identifies, in general terms, the allegedly misappropriated information as well as its purpose, application, and functionality.  (See, e.g., Doc. 1 ¶¶ 37, 50, 52).  Hence, Air Dynamics' allegations are sufficient at this stage of the litigation.

and (6) the ease or difficulty with which the information
could be acquired or duplicated legitimately by others.

Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 109 (3d Cir. 2010) (citing Crum

v. Bridgestone/Firestone N. Am. Tire, LLC, 907 A.2d 578, 585 (Pa. Super. Ct. 2006)).[3]

Customer data and lists may constitute trade secrets, Bohler-Uddeholm Am.,

Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 107 (3d Cir. 2001) (citations omitted), but they

are generally "at the very periphery of the law of unfair competition," Ozburn-

Hessey Logistics, 13 F. Supp. 3d at 474 (quoting Iron Age Corp. v. Dvorak, 880 A.2d

657, 663 (Pa. Super. Ct. 2005)) (PUTSA); see also Revzip, LLC v. McDonnell, No.

---

[3] Bimbo Bakeries involved the application of Pennsylvania's Uniform Trade
Secret Act ("PUTSA"), 12 PA. CONS. STAT. § 5301 et seq., standard.  Our court of
appeals has not decided whether PUTSA's standard applies with equal force to
DTSA claims.  Nevertheless, we think applying the PUTSA standard to DTSA cases
makes sense because the two statutes "essentially protect the same type of
information."  Freedom Med. Inc. v. Whitman, 343 F. Supp. 3d 509, 518 (E.D. Pa.
2018) (quoting Teva Pharm. USA, Inc. v. Sandhu, 291 F.Supp.3d 659, 675 (E.D. Pa.
2018)); see also Jazz Pharm., Inc. v. Synchrony Grp., LLC, 343 F. Supp. 3d 434, 444
(E.D. Pa. 2018) (same).  Moreover, in pre-PUTSA cases, the Third Circuit has
recognized that PUTSA did not substantially modify the common law definition of
"trade secret."  See Bimbo Bakeries, 613 F.3d at 109 n.7 (quoting Youtie v. Macy's
Retail Holding, Inc., 626 F. Supp. 2d 511, 522 n.10 (E.D. Pa. 2009)).  Therefore, like
other courts in this circuit, we consult misappropriation cases under Pennsylvania
common law and PUTSA to inform our understanding of the scope of the term
"trade secret" under DTSA.  See, e.g., Ozburn-Hessey Logistics, LLC v. 721
Logistics, LLC, 13 F. Supp. 3d 465, 474 n.5 (E.D. Pa. 2014) (citations omitted); see
also, e.g., Garcia v. Vertical Screen, Inc., No. CV 19-3184, 2020 WL 2615624, at *4
(E.D. Pa. May 22, 2020); PharMerica Corp. v. Sturgeon, No. 2:16CV1481, 2018 WL
1367339, at *4 (W.D. Pa. Mar. 16, 2018).  This is also consistent with the approach
employed by courts in other circuits that draw on preexisting state law proscribing
substantially similar or identical conduct.  See, e.g., Iacovacci v. Brevet Holdings,
LLC, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020); Austar Int'l Ltd. v. AustarPharma
LLC, 425 F. Supp. 3d 336, 355 (D.N.J. 2019); Abrasic 90 Inc. v. Weldcote Metals, Inc.,
364 F. Supp. 3d 888, 896 n.3 (N.D. Ill. 2019); Complete Logistical Servs., LLC v. Rulh,
350 F. Supp. 3d 512, 518 (E.D. La. 2018); Art & Cook, Inc. v. Haber, 416 F. Supp. 3d
191, 195 n.3 (E.D.N.Y. 2017).

3:19-CV-191, 2019 WL 6701835, at *7 (W.D. Pa. Dec. 9, 2019) (same).  To be protected, the information must be "a particular secret belonging to the employer, developed through its efforts or investment, and of value to the continuation of the employer's business."  Bell Fuel Corp. v. Cattolico, 544 A.2d 450, 461 (Pa. Super. Ct. 1988); see also Morgan's Home Equip. Corp. v. Martucci, 136 A.2d 838, 842 (Pa. 1957) (holding that customer information must be the result of a "material investment of employers' time and money").  However, an employee's personal contacts obtained during their employ are generally not trade secrets.  See SI Handling Sys., Inc. v. Heisley, 753 F.2d 1244, 1258-59 (3d Cir. 1985) (quoting Spring Steels v. Molloy, 162 A.2d 370, 375 (Pa. 1960)); Ozburn-Hessey Logistics, 13 F. Supp. 3d at 474 (citations omitted).  The determination of whether information constitutes a trade secret is ordinarily left to the factfinder.  See Bro-Tech Corp. v. Thermax, Inc., 651 F. Supp. 2d 378, 410 (E.D. Pa. 2009) (citations omitted).

Air Dynamics has plausibly alleged that its customer data is a trade secret. Although customer data is ordinarily on the outskirts of unfair competition law, Air Dynamics has described a uniquely valuable, confidential, and guarded asset that it has developed while operating in a sensitive government-contracting arena.  It is plausible to infer from the allegations in the complaint that Air Dynamics' customer data is the product of laborious and persistent enterprise.  There is also no indication at this procedural juncture that the subject customer data is readily available from nonprivate sources, such that it could no longer be considered "secret."  According to the complaint, Air Dynamics has gone to great lengths to

prevent this information from being disseminated outside the company.  (See Doc. 1 ¶ 33).

In reaching this conclusion, we do not ignore Aaron Lehman's contention that the contacts he developed while employed by Air Dynamics constitute personal contacts, not trade secrets.  (See Doc. 14 at 13-14).  If his business contacts were independently developed while in Air Dynamics' employ, precedent suggests that such information would not be a trade secret.  See SI Handling, 753 F.2d at 1258-59; Ozburn-Hessey, 13 F. Supp. 3d at 474.  That said, only discovery will reveal the true nature of Aaron's contacts, i.e., whether they are in fact *personal* contacts belonging to Aaron or *business* contacts belonging to Air Dynamics.

Defendants next advance two theories for why Air Dynamics' protective measures are unreasonable.  We find neither argument compelling.  As a threshold matter, we are guided by the maxim that determinations regarding the reasonableness of a company's measures to protect corporate information are often best left for the finder of fact.  See Bro-Tech, 651 F. Supp. 2d at 410 (citation omitted).

First, defendants argue that the location of Air Dynamics' software suggests its measures were unreasonable.  According to defendants, Air Dynamics' measures were unreasonable "because that software . . . was not stored on Air Dynamics' internal server (and thus subject to these security protections), but only on a single laptop computer."  (Doc. 14 at 11).  We disagree that the mere fact that the software was stored on a work laptop is proof that its measures were unreasonable or that the company did not intend to keep that software confidential.  Air Dynamics

explains in its complaint that it took a variety of steps to prevent its confidential,
proprietary information from reaching the public.  (<u>See</u> Doc. 1 ¶ 33).  It is ultimately
for the fact finder to decide whether the totality of measures taken by Air Dynamics
was reasonable.  Nor do not read Air Dynamics' complaint to suggest that the
software was *only* ever stored on a laptop and *never* subjected to enhanced
protections.  The complaint states that "[p]rior to leaving Air Dynamics, Aaron had
stored Air Dynamics' . . . software files . . . on a laptop computer . . . instead of on Air
Dynamics' internal server where files for all other Desert Wind™ projects were
stored."  (<u>Id.</u> ¶ 37).  At a minimum, this allegation creates ambiguity as to the
original storage location of the company's software and permits the inference that
the files were once located on the company's servers.

Second, defendants emphasize Air Dynamics' failure to bind Aaron Lehman
to a confidentiality or noncompete agreement.  Although it may be of evidentiary
value to the defense that Aaron was not bound by a confidentiality agreement—
especially considering the company's otherwise widespread use of these contracts,
(<u>see</u> <u>id.</u> ¶¶ 33, 143, 144)—defendants have not cited any authority for the proposition
that the absence of a confidentiality agreement *ex proprio vigore* establishes that
Air Dynamics' measures were unreasonable.  We note that Air Dynamics has
allegedly implemented other secrecy measures including, *inter alia*, password-
protecting its computer systems and limiting access to its information and systems.
(<u>See</u> <u>id.</u> ¶ 33).  Moreover, the DTSA contemplates that those who engage in
misappropriation may be liable for breaching contractual or noncontractual duties
owed to an employer.  <u>See</u> 18 U.S.C. § 1839(5); <u>see also</u> <u>Freedom Med.</u>, 343 F. Supp.

3d at 520-21 (quoting <u>BIEC Int'l, Inc. v. Glob. Steel Servs., Ltd.</u>, 791 F. Supp. 489, 548 (E.D. Pa. 1992)) (PUTSA and DTSA); <u>Neopart Transit, LLC v. CBM N.A. Inc.</u>, 314 F. Supp. 3d 628, 637-38 (E.D. Pa. 2018) (collecting cases applying Pennsylvania misappropriation law).  The lack of an express contract establishing a duty is not dispositive of the reasonableness of Air Dynamics' conduct, as noncontractual duties may exist.  It is therefore plausible that Air Dynamics' measures were reasonable.

### C.    State-Law Claims

Our jurisdiction over Air Dynamics' state-law claims is dependent on the viability of its federal law claims, over which we have federal question jurisdiction under 28 U.S.C. §§ 1331, 1338, and 18 U.S.C. § 1836(c).  Therefore, in order to entertain its state-law claims, we must have supplemental jurisdiction under 28 U.S.C § 1367 over claims that "form part of the same case or controversy."  28 U.S.C § 1367(a).  Because we will not dismiss Air Dynamics' federal claims, and because its state-law claims clearly arise from the same case or controversy, we will not dismiss the state-law claims.

## IV.    <u>Conclusion</u>

We will deny defendants' motion (Doc. 8) to dismiss.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    November 6, 2020